J. RANDALL JONES, ESQ., SBN 1927
r.jones@kempjones.com
CHAD ARONSON, ESQ., SBN 14471
c.aronson@kempjones.com
KEMP JONES LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169
Telephone: (702) 385-6000

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| K AND K PROMOTIONS, INC., | Case No.: 2:20-cv-01753-JCM-NJK |
| Plaintiff, | **AMENDED COMPLAINT** |
| v. | **JURY DEMAND** |
| WALT DISNEY STUDIOS MOTION PICTURES; PIXAR; and DISNEY STORE USA, LLC, | |
| Defendants. | |

For their Amended Complaint against Defendants, Plaintiff K and K Promotions, Inc. ("K&K") complain and allege as follows:

**NATURE OF ACTION**

K&K brings this intellectual property suit asserting claims arising under federal law, as well as pendent state law claims against Defendants for their knowing and willful appropriation and infringement of intellectual property associated with the legendary daredevil, Evel Knievel, and owned by K&K at all times relevant to this suit.

**PARTIES**

1.      K&K Promotions, Inc. ("K&K") is a Nevada corporation with its principal place of business in Clark County, Nevada.

2.      Defendant Walt Disney Studios Motion Pictures ("Walt Disney Studios") is a division of ABC, Inc., a New York corporation, a subsidiary of The Walt Disney Company, and has its principle place of business in Burbank, California.

1

3.      Defendant Pixar is a California corporation with its principal place of business in Emeryville, California.  Pixar is organized and managed by "The Walt Disney Studios," a division of The Walt Disney Company.

4.      Defendant Pixar is responsible for the production of *Toy Story 4* while Walt Disney Studios is responsible for distribution of the same.  Pixar and Walt Disney Studios are hereinafter referred to collectively as "Disney Pixar."

5.      Defendant Disney Store USA, LLC ("Disney Store USA") is a Delaware corporation duly registered and licensed to do business in Nevada, with its principal place of business in Glendale, California.

6.      Disney Store USA presently owns and operates four Disney Store, Inc. brick and mortar retail stores in Las Vegas, Nevada.  The locations of these stores are as follows: Disney Store (Fashion Show Mall), 3200 Las Vegas Boulevard South, Las Vegas, Nevada 89101; Disney Store (Las Vegas North Premium Outlets) 875 Grand Central Parkway, Las Vegas, Nevada 98106; Disney Store (Meadows Mall) 4300 Meadows Lane, Las Vegas, Nevada 89107; and Disney Store (Las Vegas South Premium Outlets) 7400 Las Vegas Boulevard South, Las Vegas, Nevada 89123.

## JURISDICTION/VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).  This Court has supplemental jurisdiction over K&K's state law claims pursuant to 28 U.S.C. § 1367(a).

8.      This Court has personal jurisdiction over Disney Pixar because, upon information and belief, Disney Pixar has created and instituted a multi-prong promotional and advertising campaign for *Toy Story 4* targeting Las Vegas, Nevada, including by deciding Las Vegas, Nevada would be the location for the announcement of *Toy Story 4*'s much-anticipated theatrical release date, *Toy Story 4*'s world exclusive premiere, the exclusive unveiling of *Toy Story 4*'s movie poster featuring infringing images, and a limited early release of *Toy Story 4*.  Upon information and belief, Disney Pixar has actively directed and overseen promotional and marketing campaigns

2

taking place at various conventions and trade shows in Las Vegas, Nevada that prominently feature infringing film, images, and merchandise.

9. This Court further has personal jurisdiction over Disney Pixar based upon the following: (a) Disney Pixar has committed tortious acts within the State of Nevada that it knew or should have known would cause injury to K&K in the State of Nevada; (b) Disney Pixar has used infringing images and promoted its infringing film in the State of Nevada, including by hosting the film's exclusive, world-wide exclusive premiere in the State of Nevada; and (c) Disney Pixar has distributed infringing films and images in the State of Nevada by making such infringing images and films available at all major commercial movie theaters in the State of Nevada, including a limited early release of the film and images in the State of Nevada. Upon information and belief, Disney Pixar has actively directed and overseen and/or executed and carried out promotional and marketing campaigns taking place at various conventions and trade shows in Las Vegas, Nevada that prominently feature infringing film and images.

10. This Court has personal jurisdiction over Disney Store USA based upon its ownership and control over four retail entities in Las Vegas, Nevada, through which Disney Store USA has marketed and sold infringing products to customers in the State of Nevada.

11. Venue is proper in the United States District Court for the District of Nevada under 28 U.S.C. § 1391(b), (c), and/or (d). Venue lies in the unofficial Southern District of this Court, where the Nevada Secretary of State registered the Evel Knievel Rights of Publicity. Venue is otherwise proper in this District because a substantial part of the events and acts giving rise to this Complaint have taken place in this judicial District.

**GENERAL ALLEGATIONS**

12. K&K is a Nevada corporation that owns the Evel Knievel rights and brand.

13. At all times relevant to this action, K&K is and has been the owner of intellectual property rights and publicity rights for Evel Knievel (collectively, the "Evel Knievel Intellectual Property"), pursuant to an assignment of rights dated October 31, 1998.

14. Under this agreement, Evel Knievel, prior to his death, conveyed and assigned to K&K ownership of the following intellectual property rights:

3

a. *Trademarks*. All trademarks, tradenames and service marks in the names "Robert Craig Knievel," "Evel Knievel," "Evel," "Knievel," and "EK" and such other names, pseudonyms, nicknames, trademarks, or monikers as Knievel may have used, or may use in the future.

b. *Copyrights*. All copyrights in any photograph, film, video tape, or other audio/visual work owned by Knievel, which captures or embodies the image, likeness, or voice of Knievel in any fashion.

c. *Rights of Publicity*. All rights of publicity and the right of privacy to be free from the commercial exploitation of the Knievel persona, as defined at common law, or through statute in the name, likeness, persona, photograph, signature, voice, image, distinctive characteristics, mannerism, gestures, or appearance of Evel Knievel.

d. *Beneficial Interests in Existing Licenses and Contracts*. All remaining rights to income and proceeds derived from licenses and grants made by Knievel during his lifetime that remain in effect after his death or to which Knievel or his estate is entitled.

15. K&K at all relevant times to this action owned Evel Knievel Intellectual Property including but not limited to the following:

a. Common-law rights in the name, likeness, image, and overall appearance of Evel Knievel used in association with entertainment and merchandise.

b. U.S. Federal Trademark Registration for trademarks related to Evel Knievel includes word marks "Evel Knievel," Nos. 2481629, 2450740, 2864119, & 3666712; "Knievel," Nos. 3666742, 3666713; "7 Inch Daredevil," No. 4687838; as well as an assortment of others covering words and logos associated with Evel Knievel.

c. U.S. Copyright Registration for the documentary motion picture *Evel Knievel: Spectacular Stunts* (Reg No. PA0001819816, Sept. 27, 2012) and visual material *Evel Knievel: Unpublished Photographs* (Reg No. VAu001208885, April 10, 2013).

d. Nevada Registration for Right of Publicity for Evel Knievel under NRS 597.800, *et seq.* (Reg. Vol 1-101, Aug. 29, 2008).

4

**The Likeness and Persona of Evel Knievel**

16.     Evel Knievel's career as a motorcycle daredevil began in the 1960's, when he toured the United States performing death-defying ramp-to-ramp motorcycle jumps in the presence of captivated audiences and television cameras.

17.     Evel Knievel gained international fame and recognition on December 31, 1967, when he famously attempted to jump his motorcycle off a ramp, over the fountain at Caesars Palace in Las Vegas, and onto another ramp some 150 feet away.  Observers watched in awe as Evel Knievel's motorcycle soared through the air and landed just short of the ramp, causing Evel to lose control of the vehicle's handlebars and bounce from the bike.  Evel suffered a crushed pelvis and femur, fractures to his hip, wrist, and ankles, and sustained a severe concussion. In part, due to the fact that this jump ended in a crash landing and resulted in significant injuries, Evel Knievel quickly rose to household fame as film of the stunt gained repeated airplay on major U.S. television networks.

18.     After recuperating, Evel continued to perform daring jumps on his motorcycle, setting a world record in 1971 when he cleared 19 Dodge cars.  In 1973, Evel thrilled a crowd of 35,000 in the Los Angeles Coliseum when he launched from a ski jump over 50 cars stacked atop one another.  On September 8, 1974, Evel Knievel attempted one of his most dangerous feats, jumping his skycycle, equipped with a steam-powered rocket, over Idaho's Snake River Canyon. This stunt was also unsuccessful, but continued to build Knievel's reputation as a national and international personality.

19.     By 1974, Evel Knievel had solidified his place in history as "America's Legendary Daredevil."[1]  Evel Knievel's status as a household name, however, was attributed "as much for his daring jumps as for his catastrophic falls, earning himself the somewhat disparaging nickname 'Crash Knievel.'"[2] According to some observers, it was specifically Evel Knievel's "dramatic crashes" that "elevated him to his status as the world's greatest stuntman."[3] As biographer Stuart

---

[1]   https://www.biography.com/performer/evel-knievel.
[2]   *Id.*
[3]   https://www.history.com/news/evel-knievel-motorcycle-jump

5

Barker put it, "[Evel's] fame had little to do with the stunts he successfully pulled off and everything to do with the epic failures and wipeouts."[4]

20.     In tandem with his reputation as America's premier stuntman, Evel Knievel became equally known for his readily identifiable iconic wardrobe: a white jumpsuit embellished only by star-spangled red, white, and blue patriotic insignia with a matching white cape and helmet and a motorcycle adorned by red, white, and blue colors.

 

21.     Corresponding to his reputation as daredevil, Evel Knievel also became well known for performing his stunts on flat track motorcycles whose design features, particulary the weight and suspension of such vehicles, make them less-than-ideal choices for landing airborne hundred-foot jumps.  Modern-day stunt motorcyclist Travis Pastrana, who in 2018 recreated Evel Knievel's legendary jump at Caesars Palace, opted to attempt the stunt using an Indian bike similar to the motorcycle Evel used in 1967.  Commenting on the bike's suitability, Pastrana stated, "My god, how did [Evel] get this tank in the air?  In true Evel fashion, every time I jump it it's scary. . . . It's super, super fast but it's not meant to fly."[5]

22.     On May 26, 1975, Evel Knievel attempted his famous jump at Wembley Stadium in London, England, which was featured on television so fans across the world could tune in to the stuntman attempting to jump 13 English-deck buses.  Akin to his famous jump at Caesars Palace, Evel Knievel's landing went awry, tearing Evel off of the bike and breaking his back.

---

[4]   *Id.*
[5]   https://nypost.com/2018/07/06/daredevil-hopes-to-best-evel-knievel-with-live-motorcycle-jumps/ .

23.     Evel was placed on a gurney from which he famously picked himself up, was helped to the stadium's podium and made an announcement to the astonished crowd: "Ladies and gentlemen of this wonderful country . . . I have to tell you that you are the last people in the world who will see me jump.  Because I will never, ever, ever jump again. I'm through."  Evel struggled away, without the aid of a stretcher, and left for a hospital.[6]

24.     Evel Knievel's retirement proved premature as he continued performing stunts in front of live audiences until the early 1980s.  His next publicized feat, jumping over 14 Greyhound buses back in the United States in Cincinnati, Ohio, was the single most watched, highest-rated show on ABC's Wide World of Sports in History.

25.     Notwithstanding his status as a fearless daredevil, Evel Knievel also demonstrated humility by admitting the fear accompanying each death-defying stunt throughout his unmatched career.  In one of his final interviews before his death, Evel Knievel humbly remarked "Sure, I was scared. You gotta be an ass not to be scared. But I beat the hell out of death."[7]

### Evel Knievel Merchandise

26.     In 1973, Ideal Toys released the Evel Knievel Stunt Cycle, a toy which features a doll of Evel Knievel in his signature red, white, and blue jumpsuit and matching helmet.  The toy includes a replica motorcycle with red, white, and blue colors featured.  The toy comes with a red "Energizer," which users wind up with the toy attached and then release, causing the toy motorcycle to propel forward.

 

---

[6] https://www.nytimes.com/2018/06/29/arts/television/evel-knievel-travis-pastrana.html.
[7] https://www.biography.com/performer/evel-knievel.

27.     A feature of the Stunt Cycle is the "doll's ability to be bent into various poses."[8] Accordingly, as one observer noted, "[c]hildren everywhere could make their doll look just like Evel at some of the key moments of his stunt career."[9]



28.     According to the book Life of Evel: Evel Knievel, "[t]he thrill of seeing Evel losing his grip on the bike (which, like the real thing, happened more often than not) and wiping out as to be cheered as enthusiastically as any safe landing, in true parallel with Knievel's own real-life audiences."[10]

29.     As stated in Evel: The High-Flying Life of Evel Knievel, "[u]nlike GI Joe or other action figures, which required a lot of imagination, Evel Knievel could provide action himself. . . . . Adjust his position at the takeoff and he did a wheelie. Put up a ramp, he climbed the ramp and flew off into the unknown. . . . The crashes were wonderful. The motorcycle went flying. He went flying in a different direction.  Maybe his helmet flew off in a third direction. He did the strangest things, landed in the strangest predicaments, and somehow always was able to get back on the bike. Exactly like the real-life character."[11]

30.     As such, the Evel Knievel Sunt Cycle became "the perfect diversions for little daredevils who loved crashing just as much as they did accomplishing a jump."[12]

[8]   https://kekbfm.com/remembering-the-greatest-toy-of-the-1970s-the-evel-knievel-stunt-cycle/.
[9]   Id.
[10]  STUART BARKER, LIFE OF KNIEVEL: EVEL KNIEVEL 123 (St. Martin's Press, 1979).
[11]  LEIGH MONTVILLE, EVEL: THE HIGH-FLYING LIFE OF EVEL KNIEVEL: AMERICAN SHOWMAN, DAREDEVIL, AND LEGEND 166-67 (Anchor Books et al., 2012).
[12]  SHARON M. SCOTT, TOYS AND AMERICAN CULTURE: AN ENCYCLOPEDIA 104 (ABC CLIO, 2010).

31.     In conjunction with release of the Stunt Cycle, Ideal Toys created a series of television advertisements which displayed, among other things, the following images.









32.     While the commercials promised the toy would deliver "Gyro power, sending [Evel] over 100ft at top speed . . . up and over that four-foot ditch," observers fondly recall the nostalgia associated with the toy's more modest performance: "[R]amps made from Beano annuals, collisions with vases, and riding over peoples feet or into drains and fireplaces."[13]

33.     The Evel Knievel Stunt Cycle would go on to generate millions of dollars' worth of sales and profits.

34.     The Evel Knievel Stunt Cycle was the number one selling toy line of 1973– 1977 and is recognized by American Classic Toys, Inc. as the "Greatest Action Toy."

**Defendants' Unlawful Use of K&K's Intellectual Property in _Toy Story 4_**

35.     In April 2018, Disney Pixar revealed the long-awaited release date for _Toy Story 4_ at the annual CinemaCon event in Las Vegas, Nevada.

36.     Less than a year later, in April 2019, Disney Pixar again took the stage at CinemaCon in Las Vegas, Nevada and screened the exclusive premiere of the first 17 minutes of _Toy Story 4_.   At the event, taking place at Caesars Palace, Defendants displayed a room-size poster of _Toy Story 4_, with its new character, "Duke Caboom," featured prominently on the top left of the poster.



---

[13]   https://www.bbc.com/news/magazine-32830377.

37.     Prior to the film's official release date, Disney Pixar chose select locations, including several in Nevada, where the film could be seen on June 20, 2019, a day before the film's worldwide release to the general public.   Upon release to the general public, these Defendants made *Toy Story 4* viewable at all major movie theaters in Las Vegas, Nevada.

38.     Disney Pixar released *Toy Story 4* worldwide on June 21, 2019, which featured a new character named "Duke Caboom," voiced by Keanu Reeves.

39.     Disney Pixar's official description of the character is as follows:

*Duke Caboom is a 1970s toy based on Canada's greatest stuntman. Riding his powerful Caboom stunt-cycle, Duke is always prepared to show off his stunt poses with confidence and swagger. However, Woody learns quickly that Duke has an Achilles heel: He has never been able to do the awesome stunts advertised in his own toy commercial. For years, Duke has been sitting in an antique store, constantly reliving the failures of his tragic past.*

40.     The film's protagonist, "Woody," voiced by Tom Hanks, is first introduced to Duke Caboom in an antique toy store by "Bo Peep," Woody's love interest.  Woody and Bo Peep seek to enlist Duke Caboom's help in rescuing a runaway toy named "Forky," who is being held hostage by "Gabby Gabby," the film's antagonist.

41.     Duke Caboom first emerges riding on a Canadian-flag colored motorcycle and dressed in a white jumpsuit, helmet, and cape with Canadian insignia, with 70's-era Motown jazz playing during his entrance.  Duke Caboom's first line in the film is "look who jumped 40 buses and landed back into my life."

42.     Duke Caboom then introduces himself to Woody as "Duke Caboom, Canada's greatest stuntman," before proceeding to strike a series of poses on his motorcycle, evocative of the classic Evel Knievel Stunt Cycle commercials.

 

43.     Bo Peep then explains how Duke Caboom can help Woody find Forky in the antique store: "Here's the plan, we need to jump over the aisle to Gabby's cabinet and *you* are the toy to do it."

44.     Duke Caboom initially refuses, revealing insecurity about his abilities as a stuntman.  Duke Caboom then explains the origin of his insecurity through a flashback to when his former child owner, Rejean, rejected him as a toy.

45.     The viewers are then taken back in time and introduced to a Rejean, playing with his Duke Caboom doll while watching a commercial advertisement for the "Duke Caboom Stunt Cycle," as identified by the commercial's announcer.  The commercial features grainy, 70s-era muted colors, and shows a child pumping the Duke Caboom Stunt Cycle, causing the toy to accelerate over a ramp and through a makeshift ring of fire and over a hockey stadium.

 



46.     With the "Duke Caboom Stunt Cycle" commercial playing in the background, Rejean tries to imitate a jump through a makeshift ring of fire as seen in the commercial, only to be dismayed that the toy could not perform as advertised in the television spot.  According to

Duke Caboom's telling of the story, "when Rejean realized I couldn't jump as far as the toy in the commercial . . . . Rejean threw me away!"

47.     As Duke Caboom erupts into tears over this memory, Bo Peep cheers him up by reminding him "right now we need the only toy who can crash us onto Gabby's cabinet! Any Duke Caboom toy can *land*.  But you are the only one that can *crash* the way you do. . . .Forget the commercial. Be the Duke you are right now—the one who jumps and crashes!"

48.     Later in the film, Woody and Duke board Duke Caboom's motorcycle together and, in preparation for jumping over the antique toy store's aisle onto the cabinet, Woody and Duke Caboom attach the motorcycle onto the red "Energizer"/propeller function.

49.     Prior to the stunt, Bo Peep seeks to calm Woody's nerves by stating, "you'll be fine, Duke's the best," to which Woody responds, "yeah . . . *at crashing*."

50.     After another toy initiates the stunt cycle's "Energizer," Duke Caboom and Woody begin accelerating on the motorcycle toward a ramp from which they intend to launch over the aisle and onto the cabinet across the room.  While Woody successfully lands on top of the target cabinet, Duke Caboom falls to the floor.

51.     In Duke Caboom's climax stunt, he is encouraged to jump 40 feet across an amusement park and through lights fabricated to look like a ring of fire. Once again, Duke Kaboom completes most of the jump, only to fall off of his motorcycle and land on the concrete.

**Defendants' Promotion of *Toy Story 4* with Advertisements and Marketing Initiatives Focused on Duke Caboom**

52.     In anticipation of *Toy Story 4*'s release, Defendants initiated a promotional campaign that highlighted the franchise's introduction of Duke Caboom.  This campaign featured television advertisements and media appearances exclusively focused on Duke Caboom.

53.     On May 2, 2019, Greg Mason, Vice President of Marketing for Walt Disney Studios Motion Pictures Canada, appeared on the Canadian morning show Breakfast Television specifically to generate buzz for Duke Caboom—both as a *Toy Story 4* character and as the subject of a new line of toy merchandise, which Mason announced had "just hit the shelves."

54.     Mason reassured viewers of the centrality of Duke Caboom's roll in the yet-to-be-released film: "***We're thrilled that Duke Caboom is a main character in Toy Story 4, it's not a cameo***, played by Keanu Reeves and we're really excited for the world to see him."

55.     Defendants also aired a series of promotional ads featuring Duke Caboom, with at least one spot exclusively dedicated to Duke Caboom.  In this ad, clips of Duke Caboom show the character performing a series of motorcycle jumps while a Duke Caboom-themed song plays in the background with the lyrics "He's the most spectacular daredevil Canada has ever seen!"

56.     The spot features Duke Caboom leaping in his motorcycle, the 70's-era mock commercial shown in *Toy Story 4*, Duke Caboom's various poses on his motorcycle and, of course, Duke Caboom crashing.

**Defendants' Exploitation of Duke Caboom Merchandise**

57.     Given the fanfare surrounding *Toy Story 4*'s introduction of Duke Caboom to the franchise, Defendants began a campaign to exploit Duke Caboom by manufacturing, packaging, labeling, and selling merchandise featuring the character.

58.     Defendants introduced merchandise called the "Disney Pixar Toy Story Stunt Racer Duke Caboom," featuring a Duke Caboom doll in the signature white jumpsuit with a cape and belt buckle adorned by red Canadian insignia, and matching helmet and motorcycle.  The toy also comes with a red "launcher" which, when pumped, "send[s] Duke and his bike on a zooming ride up to 15 feet!"



59.     Tellingly, Defendants do not label this toy the "Duke Caboom Stunt Cycle," the name given to the merchandise in the fictional mock-up commercial featured in *Toy Story 4*.

60.     In addition to the so-called "Disney Pixar Toy Story Stunt Racer Duke Caboom," Defendants are also manufacturing, distributing, and selling other Duke Caboom merchandise including but not limited to "Disney Pixar's Toy Story Duke Caboom's Stunt Show 10767 Building Kit" and the "Fisher-Price Disney Pixar Toy Story 4 Stuntman," both pictured below.

 

61.     Defendants' promotional campaign consisted of flooding the Nevada market with Duke Caboom toys, apparel, and other merchandise and offering the same at local retail outlets including Target, Kohl's, Party City, Game Shop, Walmart, Big Lots, Best Buy, Dollar Tree, and McDonalds (as part of a "Happy Meal" promotion).

62.     Defendants also sold and continue to sell Duke Caboom merchandise through its interactive website, www.shopdisney.com, which allows site visitors to access the inventory of local retailers, including those in Nevada, by clicking the site's "Store Locator & Events" tab. Even without inserting one's city, state, or zip code the website automatically alerts users whether a given product is available for purchase at a local store.

63.     Four of Defendant's retail stores are located in the State of Nevada, at which Defendants sold and continue to sell Duke Caboom merchandise.

15

**Defendants' Acknowledgement of Evel Knievel's Inspiration for Duke Caboom**

64.     *Toy Story 4* producer Mark Nielsen, when asked about the inspiration for Duke Caboom, explained that "Jonas Rivera and I, the producers, grew up in the '70s, so the toys that we've latched onto were the ones along those lines."  Nielsen continued "Duke Kaboom is a character that's straight out of the '70s childhood that I had and that Jonas had."[14]

65.     Similarly, producer Jonas Rivera explained to the Washington Post that Duke Caboom was initially intended to be a "gag character," which the Post noted represented "a stuntman evocative of Evel Knievel's era."[15]

66.     Director Josh Cooley echoed these statements, commenting that "a lot of the new toys came from us, kids of the '70s and '80s, so Duke Caboom was a stunt toy and those were big in the '70s."[16]

67.     When the Chicago Tribune interviewed Josh Cooley about the inspiration for Duke Caboom, the newspaper summarized the basis for the character as follows: "Duke Caboom is the Canuck version of that Evel Knievel toy that looked awesome on TV but couldn't quite do those advertised stunts once you got it home."[17]

68.     Upon information and belief, Defendants have expressly instructed cast members to avoid drawing any public association between Duke Caboom and Evel Knievel, even if directly asked.  Prior to the *Toy Story 4*'s theatrical release, Entertainment Tonight hosted the film's cast to promote the film.  In a telling exchange, the cast attempted to address the interviewer's question as to why the new character "Forky" was not named "Sporky," given the character's closer

---

[14]  https://www.syfy.com/syfywire/how-toy-story-4-modernized-its-toys-and-why-it-almost-introduced-an-ipad-character.

[15]  https://www.washingtonpost.com/arts-entertainment/2019/06/25/best-secrets-surprises-easter-eggs-toy-story/.

[16]  https://torontosun.com/entertainment/movies/toy-story-4-director-producers-on-bringing-back-bo-peep-alternate-storylines-and-returning-for-toy-story-5.

[17]  https://digitaledition.chicagotribune.com/tribune/article_popover.aspx?guid=1ebc3d8e-4ab8-483e-b7c6-6bbca03804b1.

resemblance to a spork.[18]  Unbeknownst to the interviewer, the filmmakers in fact "originally wanted to name the character 'Sporky,' but the word 'spork' was trademarked."[19]

69.     Actor Tom Hale, who provided the voice for Forky, struggled to answer as Tom Hanks pulled a document out of his pocket, handed it to Hale and instructed him to "look at these talking points."

70.     As Hanks hands the talking points to Hale, Hanks points to the talking points in an exaggerated manner and cautions "do not say spork," to which Tim Allen also chimes in, "do not say spork!" As the cast members shared awkward laughter, Tim Allen draws out the words "you don't want to go there."

71.     Tim Allen then suddenly points to Keanu Reeves and says excitedly: "We were going to call you Evel Knievel!"  In response, Tom Hanks elongates the word "hey" and Hale waives his arms to signify the topic is taboo.  Tom Hanks proceeds to pantomime a "cut" gesture with his fingers, suggesting this back-and-forth ought to be removed from the interview.

72.     Keanu Reeves, noticeably agitated and embarrassed, promptly pivots the conversation back to the purportedly innocuous reason the filmmakers avoided the name "Sporky."

73.     To the extent there is any doubt that the cast members were deliberately skirting the subject of intellectual property theft, Tim Allen put the issue to rest in a subsequent interview days later.  When asked why Forky was not simply named "Sporky," Allen responded "It could be me, but I think it's the Colonel Sanders problem. I think they own that. . . ."  The interviewer follows up asking "it's trademarked?" to which Allen rhetorically asks "Who wants to mess with Colonel Sanders?"[20]

74.     In a separate promotional red-carpet interview with People TV, the interviewer

---

[18]   https://www.youtube.com/watch?v=4KZODJfPKN4&t=236s.
[19]   Jesse Rifkin, *Go Fourth: Woody, Buzz Lightyear, and the Gang Return in Disney/Pixar's* Toy Story 4, BOX OFFICE MAGAZINE (June 2019), https://www.yumpu.com/en/document/read/62687819/boxoffice-june-2019.
[20]   https://www.youtube.com/watch?v=BmFaT13qKI8

17

asserts in a factual manner to Keanu Reeves that "Duke Caboom . . . is sort of like an Evel Knievel kind of type," to which the interviewer apparently expected an answer in agreement.  Instead, Reeves responds by looking away, thinking out loud with an audible sigh, and then remarking without expression "no . . . he rides a motorcycle."[21]

### Critics and Consumers Take Note of Defendants' Appropriation of the Evel Knievel Intellectual Property

75.     Notwithstanding the filmmakers' guarded approach to addressing the clear parallels between Evel Knievel and Duke Caboom, film reviewers universally caught on to the connection.

76.     In his review of *Toy Story 4* for RogerEbert.com, Matt Zoller Seitz described Duke Caboom as follows: "Keanu Reeves as Duke Caboom, an Evel Knievel-styled motorcycle rider who describes himself as the greatest stuntman in Canada."[22]

77.     The Star, a daily newspaper in Canada, identified Duke Caboom as "the outrageously patriotic daredevil" and "an Evel Knievel-type stuntman full of national pride and bravado."[23]

78.     The Insider's "10 things you didn't know about 'Toy Story 4'" listed as number 8 "Duke Caboom was inspired by a real person," and states "it turns out the toy was inspired by a real-life stuntman, Evel Knievel."[24]

79.     The website Cinema Blend, describes Duke Caboom as "Canada's greatest stuntman, an Evel Knievel-type character known for his daredevil motorcycle stunts."  The piece also picks up on Defendants' nearly carbon-copy version of a real Evel Knievel Stunt Cycle advertisement from the 1970's: "If you're curious, you can check out the video below to see a

---

[21]   https://www.youtube.com/watch?v=Wp5VACD-t6I&t=2773s.
[22]   https://www.rogerebert.com/reviews/toy-story-4-2019.
[23]   https://www.thestar.com/entertainment/movies/2019/06/21/toy-story-4-debuts-a-canadian-character-that-eight-canadian-animators-helped-bring-to-life.html.
[24]   https://www.insider.com/fun-facts-about-toy-story-4-2019-7.

commercial for the Evel Knievel Stunt Cycle toy that clearly served as some inspiration for Keanu Reeves' Duke Caboom."[25]

80.     The Toronto Sun explained that *Toy Story 4* would introduce "a host of new characters, including Evel-Knievel-like Duke Caboom (Keanu Reeves)."[26]

81.     American film critic James Berardinelli went further, stating *Toy Story 4* features "the Canadian Evel Knievel knockoff, Duke Caboom (Keanu Reeves)."[27]

82.     A movie review from ABC News noted that Duke Caboom is "1970's-era daredevil" who is "inspired by 1970s American icon Evel Knievel."[28]

83.     Live for Film reviewer Alan Simmons identified Duke Caboom as a "Canadian Evel Knievel rip-off stunt cycle rider Duke Caboom (Reeves)."[29]

84.     The MacGuffen described Duke Caboom as "a Canadian daredevil toy in the likes of Evel Knievel. Duke's dream of pulling off a big motorcycle jump is put to good use, both plot wise and in terms of slapstick."[30]

85.     The Charlotte Observer noted Duke Caboom represented "the Canadian Evel Knievel knockoff."[31]

86.     Forbes characterized Duke Caboom as "a Canadian-themed cyclist toy based on the popular '70s Evel Knievel stunt cycle that almost never worked as advertised," and deduced that "you can tell this is a movie made by adults who still like to play with their toys."[32]

87.     Consumers similarly picked up on the connection with respect to Duke Caboom as portrayed in *Toy Story 4* and Defendants' associated merchandise.

---

[25] https://www.cinemablend.com/news/2471177/new-toy-story-4-video-shows-off-keanu-reeves-duke-caboom.
[26] https://torontosun.com/entertainment/movies/toy-story-4-director-producers-on-bringing-back-bo-peep-alternate-storylines-and-returning-for-toy-story-5.
[27] https://www.reelviews.net/reelviews/toy-story-4.
[28] https://www.abc.net.au/news/2019-06-19/toy-story-4-review-disney-franchise-resets-with-keanu/11220590.
[29] https://www.liveforfilm.com/2019/06/21/review-toy-story-4-funny-and-excitingly-weird/.
[30] https://macguff.in/film-reviews/film-review-toy-story-4/.
[31] http://events.charlotteobserver.com/movie.aspx?review=1&movie_id=202138.
[32] https://www.forbes.com/sites/lukethompson/2019/10/09/blu-ray-review-forky-meets-4k-with-toy-story-4/#434a3ab7235c.

88.     Across Twitter and the comment/review boards of online retailers, consumers posted about the similarities between Duke Caboom and Evel Knievel with many under the impression that Evel Knievel is associated with the Duke Caboom the character or that Duke Caboom is indeed supposed to represent Evel Knievel voiced by Keanu Reeves.

89.     Consumers further took to social media and retailer review boards to remark on the stark differences in quality and functionality between the classic Evel Knievel Stunt Cycle and Defendants' Duke Caboom action figure.

**Evel Knievel and Duke Caboom: Side-by-Side Comparison**

*Duke Caboom*                                     *Evel Knievel*







**<u>Evel Knievel and Duke Caboom: Side-by-Side Comparison (cont'd)</u>**

*Duke Caboom*                                   *Evel Knievel*










**FIRST CLAIM FOR RELIEF**
**(Right to Publicity, NRS 597.770, *et seq.*)**

90.   K&K repeats, realleges, and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

91.   Throughout his career, Evel Knievel gained world-wide notoriety as a motorcycle stuntman and correspondingly acquired valuable goodwill and commercial value in his persona including but not limited to his persona as the quintessential patriotic daredevil on a motorcycle, well-known reputation for attempting but often falling short with respect to death-defying ramp-to-ramp jumps, and readily identifiable white-jumpsuit wardrobe and helmet with patriotic insignia.

92.   Under Nevada law, the goodwill and commercial value in Evel Knievel's persona, reputation, and image, among other things, creates an absolute and transferable property right in such goodwill and commercial value.

93.   K&K, as successor-in-interest to all Evel Knievel Intellectual Property and assignee to Evel Knievel's rights of publicity pursuant to a valid registration with the Nevada Secretary of State, has exclusive ownership and rights to all goodwill and commercial value arising from use of Evel Knievel's image and likeness.

94.   Defendants have used in commerce, and continue to use in commerce, the likeness, reputation, and image of Evel Knievel in the film *Toy Story 4* through Defendants' depiction of Duke Caboom, and has exploited the same connection through marketing, promotion, advertising, and sales of *Toy Story 4*, and in connection with the manufacturing, distribution, marketing, advertising, promotion, and sales of the Duke Caboom action figure, all without the consent or approval of K&K.

95.   As a direct and proximate result of Defendants' unlawful appropriation of Evel Knievel's rights of publicity under NRS 597.800, K&K has suffered, and will continue to suffer, monetary damages to its business, reputation, and goodwill.

96.   At all relevant times, Defendants were aware or should have been aware that K&K, as successor-in-interest to the Evel Knievel rights of publicity, was the only entity that could

1    consent to the commercial use of Evel Knievel's name, voice, signature, photograph, and/or

2    likeness, and Defendants failed and declined to obtain such consent from K&K.

3        97.    In light of Defendants' intentional and willful infringement of the Evel Knievel

4    rights of publicity, K&K is entitled to an award of exemplary and/or punitive damages.

5

6                      **SECOND CLAIM FOR RELIEF**
            **(Trade Dress Infringement, 15 U.S.C. § 1125)**

7        98.    K&K repeats, realleges, and incorporates the allegations set forth in the preceding

8    paragraphs as if fully set forth herein.

9        99.    K&K is the owner of valid and protectable statutory and common-law trademark

10    rights with respect to Evel Knievel Intellectual Property, including trade dress rights.

11       100.    The trade dress associated with Evel Knievel is non-functional and has acquired a

12    secondary meaning by virtue of its continuous use in merchandise, clothing, and entertainment

13    since the 1970s and the fame and popularity with respect to the association between the same and

14    Evel Knievel.

15       101.    Defendants have used, and continue to use Evel Knievel's trade dress in

16    connection with the marketing, promotion, advertising, and sales of *Toy Story 4*, and in connection

17    with the manufacturing, distribution, marketing, advertising, promotion, and sales of the Duke

18    Caboom action figure.

19       102.    Defendants' exploitation described immediately above is being done in a manner

20    that is likely to cause confusion or mistake, or to deceive customers as to an affiliation,

21    connection, or association between Evel Knievel and Duke Caboom.

22       103.    Defendants' exploitation of Evel Knievel's trade dress was and is intentional and

23    willful. Defendants' used and continue to use Evel Knievel's trade dress with the knowledge that

24    it was and is commercially exploiting the same for the purposes of promoting, marketing, and

25    selling *Toy Story 4*, and for the purposes of selling, offering for sale, and/or advertising and Duke

26    Caboom merchandise.

27       104.    Defendants' use of Evel Knievel's trade dress was and is in bad faith with the

28    intent to cause confusion and/or to deceive customers.

105.     As a direct and proximate result of Defendants' trade dress infringement, K&K has suffered, and will continue to suffer, monetary damages in excess of $75,000, and irreparable injury to its business, reputation, and goodwill.

106.     As a direct and proximate result of Defendants' trade dress infringement, K&K has been required to retain the services of an attorney and is entitled to an award of reasonable attorneys' fees and costs incurred in the litigation of this claim.

**THIRD CLAIM FOR RELIEF**
**(False Endorsement/False Description, 15 U.S.C. § 1125)**

107.     K&K repeats, realleges, and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

108.     K&K is the owner of valid and protectable statutory and common-law trademark rights with respect to Evel Knievel Intellectual Property.

109.     Defendants' unauthorized use in commerce of Evel Knievel's Intellectual Property in connection with Defendants' sale, promotion, advertising and marketing of *Toy Story 4*, and in connection with Defendants' manufacture, distribution, labeling, promotion, advertising, and sales of Duke Caboom merchandise constitutes a false designation of origin which is likely to cause confusion or mistake, or deceive as to affiliation, connection, or association with K&K as to the origin, sponsorship, or approval of Defendants' products and commercial activities.

110.     Defendants' use in commerce of the Evel Knievel Intellectual Property with knowledge that K&K owns the exclusive right to the commercial use of the same, constitutes intentional conduct by Defendants to make false designations or origin and false descriptions regarding Defendants' products and commercial activities.

111.     As a direct and proximate cause of such unfair competition, K&K has suffered, and will continue to suffer, monetary loss in excess of $75,000, and irreparable injury to its business, reputation, and goodwill.

112.     As a direct and proximate result of Defendants' false endorsement, K&K has been required to retain the services of an attorney and is entitled to an award of reasonable attorneys' fees and costs incurred in the litigation of this claim.

### FOURTH CLAIM FOR RELIEF
### (Trademark Dilution, 15 U.S.C. § 1125)

113.    K&K repeats, realleges, and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

114.    K&K is the owner of valid and protectable statutory and common-law trademark rights with respect to Evel Knievel Intellectual Property.

115.    K&K's ownership of statutory and common-law trademark rights with respect to Evel Knievel Intellectual Property is famous by virtue of the Evel Knievel Stunt Cycle's record-breaking sales in the 1970s and world-wide popularity since that time, and Evel Knievel's earned status as a household name and readily identifiable wardrobe and reputation as the quintessential patriotic motorcycle stuntman.

116.    Defendants have exploited, and continue to exploit for commercial gain Evel Knievel's image, likeness, and reputation in connection with the marketing, promotion, advertising, and sales of *Toy Story 4*, and in connection with the manufacturing, distribution, marketing, advertising, promotion, and sales of the Duke Caboom action figure.

117.    Each event of Defendants' commercial exploitation, including but not limited to the making, distribution, and sale of *Toy Story 4* and the merchandising of Duke Caboom, took place after Evel Knievel and the Evel Knievel Stunt Cycle marks gained world-wide fame and commercial popularity.

118.    Defendants' commercial promotion of Duke Caboom, through *Toy Story 4* and through merchandising Duke Caboom toys, is likely to, and has already caused dilution by blurring by significantly impairing any and all distinctiveness inherent in the Evel Knievel mark and the Evel Knievel Stunt Cycle mark impeding the marks' ability to serve as a unique identifier of Evel Knievel Intellectual Property.

119.    Defendants' commercial promotion of Duke Caboom, through *Toy Story 4* and through merchandising Duke Caboom toys, is likely to, and has already caused dilution by tarnishment by harming the reputation of Evel Knievel and the Evel Knievel Stunt Cycle by

promoting and marketing Duke Caboom as a character and a toy, both of which are significantly inferior in quality to the Evel Knievel persona and the Evel Knievel Stunt Cycle.

120.    As a direct and proximate cause of Defendants' trademark dilution, K&K has suffered, and will continue to suffer, monetary loss in excess of $75,000, and irreparable injury to its business, reputation, and goodwill.

121.    As a direct and proximate result of Defendants' trademark dilution, K&K has been required to retain the services of an attorney and is entitled to an award of reasonable attorneys' fees and costs incurred in the litigation of this claim.

## FIFTH CLAIM FOR RELIEF
### (Nevada Common Law Trademark Infringement/Unfair Competition)

122.    K&K repeats, realleges, and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

123.    K&K is the owner of valid and protectable statutory and common-law trademark rights with respect to Evel Knievel Intellectual Property.

124.    Defendants' purported creation, Duke Caboom, both for use as a character in *Toy Story 4* and for merchandising purposes, is confusingly similar to the protected image and likeness of Evel Knievel and the Evel Knievel Stunt Cycle, respectively, and therefore likely to cause confusion or mistake, or deceive as to affiliation, connection, or association with K&K as to the origin, sponsorship, or approval of Defendants' products and commercial activities

125.    Defendants' unauthorized use of Evel Knievel Intellectual Property for commercial exploitation was and is done in bad faith and with the intent to cause confusion and/or to deceive customers and, consequently, profit from the same.

126.    As a direct and proximate result of Defendants' unfair competition and trademark infringement, K&K has suffered, and will continue to suffer, monetary damages in excess of $75,000, and irreparable injury to its business, reputation, and goodwill.

127.    As a direct and proximate result of Defendants' unfair competition and trademark infringement, K&K has been required to retain the services of an attorney and is entitled to an award of reasonable attorneys' fees and costs incurred in the litigation of this claim.

### SIXTH CLAIM FOR RELIEF
**(Nevada Common Law Unjust Enrichment)**

128.    K&K repeats, realleges, and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

129.    K&K, as owner of Evel Knievel Intellectual Property, has conferred a benefit upon Defendants by promoting and maintaining the strength, validity, fame, and popularity of said intellectual property, including the goodwill and commercial value associated with the same.

130.    Defendants, by virtue of their unauthorized incorporation of the Evel Knievel Intellectual Property into the character Duke Caboom and into its merchandising of the character has appreciated the benefits of this commercial exploitation.

131.    Defendants have accepted and retained the benefits of its unauthorized use of Evel Knievel Intellectual Property by obtaining significant profits through the promotion and sale of *Toy Story 4* and the marketing and sale of Duke Caboom merchandise.

132.    Under such circumstances, it would defy principles of equity and good conscience if Defendants were permitted to keep the monetary benefits associated with their unlawful use of Evel Knievel Intellectual Property.

133.    As a direct and proximate result of Defendants' retention of said monetary benefits, K&K has suffered, and will continue to suffer, monetary damages in the form of lost profits, licensing agreements, and/or commercial exploitation in excess of $75,000, all of which rightfully belong to K&K.

134.    As a direct and proximate result of Defendants' being unjustly enriched, K&K has been required to retain the services of an attorney and is entitled to an award of reasonable attorneys' fees and costs incurred in the litigation of this claim.

/ / /

/ / /

/ / /

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, K&K respectfully requests that this Court enter judgment in its favor and against Defendants and prays as follows:

a.      An award of actual damages, compensatory damages, statutory damages, and profits stemming from Defendants' unlawful conduct in an amount to be determined at trial;

b.      An award of exemplary/punitive damages owing to Defendants' willful appropriation and/or infringement, in an amount to be determined at trial;

c.      An award of interest, costs, and attorneys' fees incurred by K&K in prosecuting this action; and

d.      For other and further relief as this Court may deem just and proper.

DATED this  3rd    day of November, 2020

_/s/ J. Randall Jones_
J. RANDALL JONES, ESQ., SBN 1927
r.jones@kempjones.com
CHAD ARONSON, ESQ., SBN 14471
c.aronson@kempjones.com
KEMP JONES LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169
Telephone: (702) 385-6000

*Attorneys for Plaintiff*