MARK G. TRATOS, ESQ.
Nevada Bar No. 1086
KARA B. HENDRICKS, ESQ.
Nevada Bar No. 7743
DONALD L. PRUNTY, ESQ.
Nevada Bar No. 8230
BETHANY L. RABE, ESQ.
Nevada Bar No. 11691
**GREENBERG TRAURIG, LLP**
10845 Griffith Peak Dr., Suite 600
Las Vegas, Nevada  89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002
Email:   tratosm@gtlaw.com
            hendricksk@gtlaw.com
            pruntyd@gtlaw.com
            rabeb@gtlaw.com

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| K AND K PROMOTIONS, INC., | Case No.:   2:20-cv-01753-JCM-NJK |
| Plaintiff, | |
| v. | **RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT** |
| WALT DISNEY STUDIOS MOTION PICTURES GROUP; PIXAR; and DISNEY STORE USA, LLC, | |
| Defendants. | |

Defendants WALT DISNEY STUDIOS MOTION PICTURES, PIXAR, and DISNEY STORE USA, LLC (collectively "Defendants"), by and through their undersigned counsel, GREENBERG TRAURIG, LLP, hereby submit this Response in Opposition to Plaintiff's Motion for Leave File Second Amended Complaint (ECF No. 40).

/ / /

/ / /

1

This Response is based upon the pleadings on file herein, the attached Memorandum of Points and Authorities, and any oral argument the Court may permit.

DATED this 13th day of August, 2021.

**GREENBERG TRAURIG, LLP**

/s/ Mark G. Tratos
MARK G. TRATOS, ESQ.
Nevada Bar No. 1086
KARA B. HENDRICKS, ESQ.
Nevada Bar No. 7743
DONALD L. PRUNTY, ESQ.
Nevada Bar No. 8230
BETHANY L. RABE, ESQ.
Nevada Bar No. 11691
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada  89135

*Counsel for Defendants*

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

This Court should deny Plaintiff's motion for leave to amend its complaint both because Plaintiff has not shown excusable neglect for its requested extension of the scheduling order deadline and because amendment would be both unduly prejudicial to Defendants and futile.

Defendants' motion to dismiss has been fully briefed since December of 2020.  Were Plaintiff's motion to amend granted without the benefit of this Court's ruling on Defendants' motion to dismiss, Defendants would be prejudiced by the necessity of renewing their long-pending motion and incurring the costs and expenses of protracted litigation.

More fundamentally, Plaintiff's proposed amendments would be futile.  Plaintiff's Proposed Second Amended Complaint essentially does two things: it seeks to impose liability upon Defendants for comparing the toy stuntman Duke Caboom character in *Toy Story 4* with the real-life stuntman Evel Knievel, and it seeks to impose liability upon Defendants because a

2

licensee allegedly used the descriptive phrase "9-inch motorcycle daredevil" to describe a 9-inch motorcycle daredevil toy.  Neither has merit.

No intellectual property right prohibits Defendants from drawing inspiration from the 1970s Evel Knievel stunt cycle toy set in creating the fictional Duke Caboom character.  Likewise, no intellectual property right prohibits Defendants from using Evel Knievel as a reference point in talking about the fictional Duke Caboom toy character.  Even taking Plaintiff's allegations as true – that Defendants did things like tell people Duke is like "the Canadian Evel Knievel" or an "Evel-Knievel-esque" character – this is simply not a basis of liability, as these are not trademark uses of the EVEL KNIEVEL mark or "commercial uses" under Nevada's straightforward right of publicity statute.  While Plaintiff certainly enjoys intellectual property rights associated with Mr. Knievel, those rights do not remove Mr. Knievel's name from the public discourse and do not preclude reference to him as a popular culture archetype.

Similarly, Plaintiff's 7 INCH DAREDEVIL trademark does not prevent Defendants' licensee from accurately describing their 9-inch motorcycle daredevil toy as a "9-inch motorcycle daredevil."  The advertisement to which Plaintiff refers includes this as a descriptive phrase and not in a trademark sense.

The law does not reach as far as Plaintiff argues, and for good reason: intellectual property rights that effectively limit speech are cabined by the First Amendment.  While trademark law will stop a use that is likely to confuse consumers as to the source of origin for goods or services, and while right of publicity law will stop a *commercial* use of a person's name and persona rights without permission, neither applies here.  As such, this Court should deny Plaintiff's motion for leave to amend.

## II.     BACKGROUND

This lawsuit arises out of Plaintiff's allegations that the toy character "Duke Caboom" in the movie *Toy Story 4* is too much like the real-life Evel Knievel – or, more specifically, a 1970s toy set which included an Evel Knievel action figure and motorcycle toy.  Mr. Knievel was an American stunt daredevil active in the 1960s and 1970s.  *See* First Amended Complaint, ECF No. 18, at ¶¶ 16-25.  He was known for his daring motorcycle jumps and "catastrophic falls." *Id*.

3

The premise behind the *Toy Story* movies is that the toys are sentient; toys only pretend to be inanimate in the presence of people.  *Toy Story 4* was released in 2019 and introduced several new toy characters.  One of these was Duke Caboom, a toy action figure of a Canadian motorcycle stuntman who wears a Canadian-themed white jumpsuit with red embellishments and a Canadian-flag cape. *Id*. at ¶¶ 38-42. Despite Duke's outward bravado, he suffers from insecurity; his original owner threw him away because he could not perform the stunts advertised in a toy commercial. *Id*. at ¶¶ 44-46.

In 2020, Plaintiff sued Defendants: Plaintiff asserts various intellectual property rights relating to Mr. Knievel, and that Defendants' portrayal of Duke Caboom violates certain of these rights.  *See generally id*.  In November of 2020, Defendants filed a motion to dismiss for failure to state a claim, pointing out the fatal flaws in the allegations in Plaintiff's First Amended Complaint. *See* ECF No. 23.  That motion remains pending.

Meanwhile, discovery confirmed that Plaintiff does not hold reproduction rights to the Evel Knievel action figure, and as recently as May of 2020, Plaintiff was uncertain as to which intellectual property rights, if any, it actually held.[1]  The deadline for amendment of the pleadings passed on June 17, 2021.  Thereafter, the parties agreed to extend the discovery period for 120 days, but Plaintiff did not ask Defendants to stipulate to extend the deadline for amendment of the pleadings.  *See* ECF No. 37.  That stipulation was filed on July 20, 2021.  *Id*.

Eight days later, without meeting and conferring with Defendants counsel, Plaintiff filed the instant motion requesting leave to amend its First Amended Complaint.  Plaintiff alleges that in the course of discovery, Defendants have produced documents that indicate that Evel Knievel – more specifically, a toy Evel Knievel stunt cycle set of the 1970s – was one of the inspirations for the character Duke Caboom.  *See generally* Proposed Second Amended Complaint, at ¶¶ 35-38.

/ / /

---

[1]  In a document produced by Plaintiff in discovery as Bates numbers K&K003891-92 and dated May 22, 2020, Kelly Knievel admits he had never seen certain key contracts relating to the Evel Knievel action figure and toy set.  This acknowledges that at least as of May of 2020, he did not know who owned the reproduction rights in the original stunt cycle action figure or motorcycle.  *See* **Exhibit A**.  As demonstrated by **Exhibit B**, the copyright was registered to Ideal Toy Company in the 1970s.

4

Plaintiff seeks to add allegations of various purported statements by Defendants comparing the Duke Caboom toy character to Evel Knievel.  Some of these statements were made by Defendants internally, such as in a draft script or pitch materials that explain the movie to other Disney entities.  *See id*. at ¶¶ 35-43.  Plaintiff also alleges on information and belief that Pixar "pitched the mantra 'Think Evel Knievel' to various external entities" when seeking to enter into agreements to market *Toy Story 4* or licensing agreements for the sale of Duke Caboom merchandise.  *Id*. at ¶ 44.  Plaintiff also seeks to add allegations that Defendants distributed press releases and writings to media outlets that used the name Evel Knievel.  *Id*. at ¶ 64.  Finally, Plaintiff adds allegations that a licensee of Defendants used the term "9-inch motorcycle daredevil" to advertise the subsequent Duke Caboom toy.

On these newly alleged facts, Plaintiff seeks, first, to add a new cause of action for trademark infringement based on the alleged statements comparing Duke Caboom to Evel Knievel and based on Defendants' licensee's use of the descriptive phrase "9-inch motorcycle daredevil," which Plaintiff claims infringes its trademark 7 INCH DAREDEVIL.  And, second, Plaintiff seeks to add a new basis for its right of publicity claim based on the alleged statements by Defendants "invoking the name 'Evel Knievel'."

## III.   ARGUMENT

### A.   This Court Should Rule on the Pending Motion to Dismiss Before Considering This Motion to Amend.

As an initial matter, Defendants respectfully ask that the Court rule on the pending motion to dismiss before considering this instant motion for leave to amend.  The Federal Rules "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."  *See* Fed. R. Civ. P. 1.  Here, Defendants' motion to dismiss has been fully briefed since December 9, 2020.  That motion is meritorious and should dispose of each claim in Plaintiff's First Amended Complaint.  A ruling on that motion first would further judicial economy because it would eliminate Plaintiff's meritless causes of action, or at the very least narrow the issues before the Court.  Importantly, the Proposed Second Amended Complaint simply purports to add new bases of liability: a new basis for the

right of publicity claim and a new cause of action for trademark infringement.  These proposed new causes of action in the Second Amended Complaint do not affect the reasoning behind Defendants' motion to dismiss the First Amended Complaint.[2]  As such, this Court should issue its decision on the First Amended Complaint first, before deciding the merit of further amendment.

In contrast, ruling on the motion to amend first would result in the amendment of a defective complaint without the benefit of the Court's ruling on the pending motion that may narrow or eliminate certain claims.  Thereafter, Defendants would be forced to file another motion to dismiss containing the same bases as the original motion to dismiss including issues not affected by the proposed amendment.

Moreover, were the Court to permit Plaintiff the opportunity to attempt to cure any of the defects in the First Amended Complaint, it would be more efficient for Plaintiff to – at that time – add the "new" facts and claims it attempts to assert here.

**B.**    **Plaintiff's Motion Should Be Denied for Failure to Show Excusable Neglect.**

A party seeking to extend a scheduled deadline after it has passed must show not only good cause, but also excusable neglect.  *See* LR 26-3 ("A request made after the expiration of the subject deadline ***will not be granted*** unless the movant also demonstrates that the failure to act was the result of excusable neglect") (emphasis added); *see also* Fed. R. Civ. P. 6(b)(1)(B).  "When leave to amend is sought after the amendment deadline in the court's scheduling order has expired, the movant must also show good cause to reopen the amendment period ***and*** excusable neglect for the delay."  *See Counter Wraps Int'l, Inc. v. Diageo N. Am. Inc*., 2017 U.S. Dist. LEXIS 194087, at *3 (D. Nev. Nov. 22, 2017) (emphasis added); *see also Torres v. Rothstein*, 2021 U.S. Dist. LEXIS 976, at *6 (D. Nev. Jan. 5, 2021).

To evaluate good cause, a court looks at the diligence of the party seeking the modification of the scheduling order.  *See, e.g.*, *Johnson v. Mammoth Recreations, Inc*., 975 F.2d 604, 608 (9th Cir. 1992).  To evaluate excusable neglect, the court weighs: "(1) the danger of prejudice to the non-moving party, (2) the length of the delay and its potential impact on judicial proceedings, (3)

---

[2]   To the extent that the new facts alleged in the Proposed Second Amended Complaint may impact the other causes of action, the legal reasoning remains intact even with these new facts.

the reason for the delay, including whether it was within the reasonable control of the movant, and (4) whether the moving party's conduct was in good faith." *See Pincay v. Andrews*, 389 F.3d 853, 860 (9th Cir. 2004) (citing *Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership*, 507 U.S. 380, 395, 113 S. Ct. 1489, 123 L. Ed. 2d 74 (1993)).

Here, Plaintiff fails to address the excusable neglect requirement at all. And, with all due respect, it may be that the conduct here is not entirely in good faith as Plaintiff neither mentioned nor raised this request during the parties' discussions precipitating the stipulation extend discovery deadlines, which was filed on July 20, 2021, only eight days prior to Plaintiff filing this motion. Plaintiff never sought a stipulation or consent from Defendants, preferring to file its present motion.

## C. **Plaintiff's Motion Should be Denied Because Amendment Would be Prejudicial and Futile.**

"In determining whether leave to amend is appropriate, the district court considers the presence of any of four factors: bad faith, undue delay, prejudice to the opposing party, and/or futility" of the amendment. *See Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001). These factors weigh against the proposed amendment here.[3]

As to prejudice, perhaps realizing that Defendants' pending motion to dismiss is fatal to its claims and that its case is not getting better with discovery, Plaintiff has seemingly brought this motion as a delay tactic. If Plaintiff is permitted to amend its complaint now, Defendants would be forced to file a new motion to dismiss, which likewise may not be decided imminently. In the meantime, Defendants would continue to incur significant costs of discovery and other litigation expenses.[4] As detailed above, judicial economy is best served by a ruling on the pending motion to dismiss which will also minimize the prejudice to Defendants and streamline any remaining discovery in this matter.

---

[3] Plaintiff notes a fifth factor, whether the plaintiff has already amended the complaint. Defendants agree that that factor is not at issue here given that Plaintiff's prior amendment simply corrected the names of Defendants.

[4] For example, because of Plaintiff's fundamental misunderstanding of the interface and application of rights of publicity, trademark, and copyright rights, multiple IP experts may be required to educate a jury on the lack of enforceable rights held by Plaintiff against an audiovisual work protected by the First Amendment.

Substantively, this Court should not permit the amendment as futile.  "A proposed amended complaint is futile if it would be immediately subject to dismissal."  *Dolin v. Facebook, Inc.*, 2018 U.S. Dist. LEXIS 74614, at *17 (N.D. Cal. May 2, 2018), *quoting Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998). "The proper test to be applied when determining the legal sufficiency of a proposed amendment is identical to the one used when considering the sufficiency of a pleading challenged under Rule 12(b)(6)."  *Id.*, *quoting Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988).  "When a proposed amendment would be futile, there is no need to prolong the litigation by permitting further amendment." *Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083, 1088 (9th Cir. 2002) (affirming the trial court's denial of leave to amend where plaintiffs could not cure a basic flaw—inability to demonstrate standing— in their pleading).  As such, this Court should decline to permit amendment if the new bases of liability would be subject to dismissal pursuant to the 12(b)(6) standard.

### 1.    Amendment is Futile Where Plaintiff's Factual Allegations are Insufficient to State a Claim.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009), *quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Facial plausibility requires the plaintiff to plead "***factual content*** that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (emphasis added). "For purposes of a Rule 12(b)(6) review, vague allegations, unreasonable inferences, and legal conclusions are not entitled to the assumption of truth."  *See Brown v. Lever*, 2019 U.S. Dist. LEXIS 19289, at *4 (D. Nev. 2019).  A complaint cannot survive on "naked assertions devoid of further factual enhancement."  *Iqbal*, 556 U.S. 662, 678 (*quoting Twombly*, 550 U.S. 544, 557, *internal quotations omitted*).

Here, Plaintiff's new allegations do not plead sufficient factual content to support their purported new bases of liability.  As to the trademark infringement claim, Plaintiff includes reference to Defendants "soliciting the investment in the *Toy Story 4* film by distinct entities ultimately participating in the production and distribution of the same, and in promotional

campaigns to solicit the buy-in of merchandise licensees for the creation and commercial sale of Duke Caboom toy merchandise." *See* Proposed Second Amended Complaint at ¶ 125.  As to the right of publicity claim, Plaintiff includes reference to statements "soliciting the purchase of licensing agreements for the sale of Duke Caboom merchandise," and "soliciting the investment of distinct entities' financial contribution to Pixar's yet-to-be-released *Toy Story 4*." *Id*., at ¶ 118. However, these statements are unsupported by factual allegations in the proposed complaint. Paragraph 44 alleges "upon information and belief" that Pixar told "various external entities – whether under the Disney umbrella or not" to think of Evel Knievel in suggesting they enter into licensing agreements for the sale of Duke Caboom merchandise, but its examples include only Disney entities.  There are ***no*** factual allegations in the complaint about solicitation of "financial contribution" to the film.  And the allegations regarding Defendants' statements to the press are also alleged upon information and belief, and lack specifics as to what was said.  *See id*. at ¶ 69. These vague and conclusory allegations do not push the new claims "across the line from conceivable to plausible," and therefore amendment would be futile.  *See Twombly*, 550 U.S. 544, 570.

### 2. Amendment to Add a Trademark Infringement Cause of Action Under the Lanham Act is Futile.

The Lanham Act is a consumer protection statute and aims to ensure that consumers are not misled as to the source of goods or services.  It prohibits the use of a source-identifier (*i.e.*, a logo or brand name) that is confusingly similar to a source-identifier already in use in connection with similar goods or services: if I start a shoe company, I can't use a "swoosh" on the side of my sneakers because consumers would likely be confused as to whether Nike was truly the source of the shoes.  On the other hand, where a term does *not* serve as an indicium of the source of the goods or services to consumers, it is not functioning as a trademark, and can be used freely: I could run an ad inviting consumers to try my shoes by saying they are "better than Nike" without running afoul of trademark law, so long as it is not misleading as to source.

Here, even taking the allegations in the Proposed Second Amended Complaint as true, Plaintiff cannot state a claim for trademark infringement because use of the term "Evel Knievel"

as a point of reference to describe the qualities of the Duke Caboom character, and use of the term "9-inch motorcycle daredevil" to accurately describe a 9-inch long motorcycle daredevil toy are simply not trademark uses. They do not tell consumers the source or origin of goods or services, but instead describe characteristics of the goods or services. As such, the proposed amended claim fails as a matter of law.

(a)     **Use of "Evel Knievel" in Statements About Duke Caboom or Toy Story 4.**

Plaintiff alleges in its Proposed Second Amended Complaint that "Defendants circulated various press releases and writings to media outlets in March 2019 using the name 'Evel Knievel,' causing various outlets to parrot Defendants' description." *See* Proposed Second Amended Complaint, at ¶ 64, *see also* ¶ 69. The complaint goes on to cite examples of articles about Toy Story 4 that make reference to Duke Caboom as an "Evel Knievel-esque" character (or similar comparative language). *Id.* at ¶ 65-68. Plaintiff also alleges that Defendants compared Duke Caboom to Evel Knievel in soliciting investment in the film and in promotional campaigns to solicit the buy-in of merchandise licensees for Duke Caboom toy merchandise, by again comparing Duke Caboom to Evel Knievel. *Id.* at ¶ 44, 130. These allegations do not state a claim as a matter of law.

i.     The alleged intra-company use is not a trademark use.

As an initial matter, some of Plaintiff's alleged statements are internal communications, private communications, or non-public communications to companies under the Disney umbrella. For example, Plaintiff alleges use of the name Evel Knievel within Pixar tossing around ideas for a character, in an offer letter to actor Keanu Reeves, and in a pitch by Pixar to Disney Interactive. These are not trademark uses because the use of the name "Evel Knievel" in these contexts cannot impact consumer behavior. "…[A] company's internal utilization of a trademark in a way that does not communicate it to the public is analogous to an individual's private thoughts about a trademark. Such conduct simply does not violate the Lanham Act…" *See Saint Louis Univ. v. Meyer*, 625 F. Supp. 2d 827, 830 (E.D. Mo. 2008), *quoting 1-800 Contacts, Inc. v. WhenU.Com, Inc*., 414 F.3d 400, 409 (2nd Cir. 2005) and collecting authorities; *cf.* RESTATEMENT 3D OF UNFAIR COMPETITION, § 18 (noting that intra-company sales that do not expose the trademark to prospective purchasers

will not support a claim to trademark rights).   It is often said that the *sine que non* of trademark infringement is likelihood of consumer confusion; as such, these non-public uses of the name "Evel Knievel" cannot support a trademark infringement cause of action as a matter of law.[5]

                      ii.      <u>The alleged external-facing uses are not a trademark use</u>.

Plaintiff's description of the remainder of Defendants' alleged conduct similarly fails to assert any wrongful use of "Evel Knievel."  Use of a trademarked term to refer to the trademark owner's product or service by that name is permitted under the law, and is not considered a trademark use of the term.  As the Ninth Circuit has explained, "it is often virtually impossible to refer to a particular product for purposes of comparison, criticism, point of reference or any other such purpose without using the mark." *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 306-07 (9th Cir. 1992).  The *New Kids* court explained although one could refer to "the professional basketball team from Chicago," it is simpler to say "the Chicago Bulls," and this is permissible because such a use "does not imply sponsorship or endorsement of the product, because the mark is used only to describe the thing, rather than to identify the source." *Id.*  Indeed, the court cautioned, "[m]uch useful social and commercial discourse would be all but impossible if speakers were under threat of an infringement lawsuit every time they made reference to a person, company or product by using its trademark." *Id.*

For this reason, courts have held that trademark holders cannot stop others from using the trademarked term "Volkswagen" to advertise the repair of Volkswagens,[6] the trademarked term "Boston Marathon" to tell viewers that a television station would show the Boston Marathon,[7] or the trademarked term "Chanel No. 5" to inform consumers that a competing perfume smells like Chanel No. 5.[8]  *Id.* at 307.  The makers of the Slip-N-Slide could not use trademark law to enjoin a film from including a scene using and referring to a Slip-N-Slide, advertising using that scene, or creating

---

[5]  Plaintiff, in its communications with its licensee, California Creations, was engaging in the same types of communications and Plaintiff must concede that its licensee was not infringing the GI JOE mark by suggesting to Plaintiff that an Evel Knievel action figure be "upgraded" in ways that make it more similar to a certain GI Joe figure.  *See* **Exhibit A**.

[6]  *Volkswagenwerk AG v. Church*, 411 F.2d 350 (9th Cir. 1969).

[7]  *WCVB-TV v. Boston Athletic Ass'n*, 926 F.2d 42 (1st Cir. 1991).

[8]  *Smith v. Chanel, Inc.*, 402 F.2d 562 (9th Cir. 1968).

a video game involving the Slip-N-Slide scene.  *See Wham-O, Inc. v. Paramount Pictures Corp.*, 286 F. Supp. 2d 1254, 1263 (N.D. Cal. 2003) (noting that "[o]ther verbal formulas (*e.g.*, 'water slide' or 'lubricated plastic sheet') do not capture or identify the toy with adequate specificity, and trademark law does not compel individuals to 'use absurd turns of phrase' simply to avoid trademark liability.").  The same holds true for people who have registered a trademark in their name.  *See, e.g.*, *New Kids on the Block*, 971 F.2d 302 (the band "New Kids on the Block" could not stop newspapers from running 1-900 number polls about the New Kids' popularity); *Clark v. Am. Online, Inc.*, 2000 U.S. Dist. LEXIS 17368, at \*18 (C.D. Cal. 2000) (reference to celebrity Dick Clark on advertising mailer as part of an effort to invoke the 1950s and 1960s was not trademark infringement of DICK CLARK mark).

These types of uses are called "nominative fair use," and are appropriate for disposition on a motion to dismiss.  *See, e.g.*, *Applied Underwriters, Inc. v. Lichtenegger*, 913 F.3d 884, 887 (9th Cir. 2019) (affirming 12(b)(6) dismissal based on nominative fair use); *Beachbody, LLC v. Universal Nutrients, LLC*, 2016 U.S. Dist. LEXIS 94097, at \*6-7 (C.D. Cal., 2016) (where plaintiff did not allege sufficient facts to defeat the defendants' assertion of nominative fair use, trademark infringement claim dismissed); *Adaptive Mktg. LLC v. Girard Gibbs LLP*, 2009 U.S. Dist. LEXIS 131474, at \*14 (C.D. Cal. 2009) (dismissing on the basis of nominative fair use).

To evaluate nominative fair use, courts look at "whether (1) the product was 'readily identifiable' without use of the mark; (2) defendant used more of the mark than necessary; or (3) defendant falsely suggested he was sponsored or endorsed by the trademark holder." *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1175-76 (9th Cir. 2010) (*citing Playboy Enterprises, Inc. v. Welles*, 279 F.3d 796, 801 (9th Cir. 2002)).  The burden is on the plaintiff to demonstrate that nominative fair use does not apply.  *Id*. at 1182.

Here, just as trademark law does not require someone wanting to refer to the Bulls to say "the professional basketball team from Chicago," Defendants may use "Evel Knievel" as a reference point for the archetype quality of a brave but often unsuccessful stuntman instead of saying that Duke Caboom bears similarities to "1970s-era motorcycle stuntmen who exhibit bravado but crash a lot." Taking the allegations in the complaint as true, Defendants described Duke Caboom by comparing

the Canadian character to Evel Knievel (*e.g.*, by describing him as a Canadian version of Evel Knievel or being "Evel Knievel-esque").[9]  There is no allegation that Defendants took more of the Evel Knievel trademark than was necessary in press releases or statements (such as distinctive font) or made the Evel Knievel name bold or in offset lettering.  *See, e.g.*, *Brother Records, Inc. v. Jardine*, 318 F.3d 900, 908 (9th Cir. 2003), *impliedly overruled on other grounds by KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc*., 543 U.S. 111 (2004) (where it was "virtually impossible to refer to the Beach Boys without using the trademark," and where the plaintiff did not allege that the defendant used any distinctive logo, phrase, or anything else not needed to identify the Beach Boys, first and second elements were met).  Further, the fact that Defendants are alleged to have described Duke Caboom as *similar to* Evel Knievel cuts against consumer confusion.  There is no allegation that Defendants stated that Duke Caboom *was* Evel Knievel, or that Defendants stated that Evel Knievel sponsored or endorsed *Toy Story 4*.  Non-misleading comparisons are permissible.  This Court should deny Plaintiff's motion for leave to amend.

iii.    <u>Even if these alleged uses were considered trademark uses, there can be no liability pursuant to *Rogers*.</u>

Even if this Court were to consider Defendants' alleged uses as trademark uses that would typically fall within the Lanham Act, it is well-settled that the Lanham Act does not generally apply to expressive works or the advertising for such works.  Courts use the *Rogers* test to balance the competing interests at stake when a trademark owner claims that an expressive work infringes its trademark rights.  *See Gordon v. Drape Creative, Inc*., 909 F.3d 257, 260-61 (9th Cir. 2018), *citing Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989).  The test construes the Lanham Act to apply to expressive works *only* where the public interest in avoiding consumer confusion outweighs the public interest in free expression, which is very rarely.  *Id*.  If a use is protected under the *Rogers* test, that protection extends to use to advertising and the sale and licensing of goods.  *See Twentieth Century Fox TV v. Empire Distrib., Inc*., 875 F.3d 1192, 1195-96 (9th Cir. 2017).[10]

---

[9] It is unclear exactly what Plaintiff is alleging that Defendants told the media.

[10]  To the extent that Plaintiff's proposed additional facts are meant to impact the false endorsement cause of action or other Lanham Act claims, Defendants' *Rogers* arguments here apply equally to those causes of action.

The *Rogers* test is discussed in detail in Defendants' motion to dismiss (ECF No. 23), explaining why Plaintiff's other Lanham Act claims must fail on this basis.  Here, the rationale is just as compelling.  Defendants would have been within their First Amendment rights to use the trademarked term EVEL KNIEVEL in their expressive work, *Toy Story 4* (although there is no allegation that they did so here).  *See Rogers*, 875 F.2d 994 (upholding use of plaintiff Ginger Rogers' name in title of movie where a character in the movie was compared to Ms. Rogers); *Roxbury Entm't v. Penthouse Media Grp., Inc*., 669 F. Supp. 2d 1170, 1176 (C.D. Cal. 2009) (upholding use of plaintiff's trademark as title of movie); *see generally E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc*., 547 F.3d 1095, 1099 (9th Cir. 2008) (upholding use of a sound-alike name to the plaintiff's trademark in video game). Had Defendants used EVEL KNIEVEL in some manner, they also would have been within their rights to advertise the film and sell merchandise as well.  *See Twentieth Century Fox TV v. Empire Distrib., Inc*., 875 F.3d 1192, 1195-96 (works protected under the *Rogers* test may be advertised and marketed by name).

What is alleged here is even one step further removed from those permissible situations. Here, Defendants are not alleged to have used the name "Evel Knievel" in the film.  Defendants are alleged only to have used the name "Evel Knievel" as a shorthand reference point for the qualities of the character within their expressive work (i.e., like Mr. Knievel, Duke Caboom is a sometimes-failing motorcycle stuntman of the 1970s).  It would defy common sense if Defendants could use the trademark in promoting their movie if they *had* expressly used the mark in the film, but could face trademark infringement liability for mentioning the name even though they did *not* use the trademark in the movie.

Defendants' alleged use of the name "Evel Knievel" in press releases or other internal or external communications is simply not a trademark use, and even if it was, it is protected by the First Amendment.  As such, this Court should deny leave to amend to add this allegation as a basis for liability.

### (b)    Use of "9-inch Motorcycle Daredevil"

Likewise, the alleged use by an independent licensee of the term "9-inch motorcycle daredevil" in an advertisement for a toy of the Duke Caboom character cannot give rise to

trademark infringement liability as a matter of law.  The fact that a word or phrase is registered as a trademark does not prevent others from using a similar word or phrase to accurately describe their own goods.  As the Supreme Court recognized long ago, a trademark "does not confer a right to prohibit the use of the word or words…  A trade mark only gives the right to prohibit the use of it so far as to protect the owner's good will against the sale of another's product as his… When the mark is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth.  It is not taboo."  *See Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368, 44 S. Ct. 350, 351 (1924).  As such, where a word or phrase is "used to tell the truth" about one's own product, there is no violation of trademark law.  As one court succinctly explained, "[t]he hypothetical producer of "Crunchy" brand potato chips, for example, cannot block its competitors from describing their chips as crunchy. It may, though, be able to block its competitors from selling chips that are *branded* "Crunchy."  *See Sorensen v. WD-40 Co*., 792 F.3d 712, 722 (7th Cir. 2015) (holding that use of the word "inhibitor" on WD-40 bottle did not infringe competitor's THE INHIBITOR mark); *see generally Park 'N Fly, Inc. v. Dollar Park and Fly, Inc*., 469 U.S. 189, 200, 105 S. Ct. 658, 83 L. Ed. 2d 582 (1985) (noting that the Lanham Act was not intended to "create an exclusive right to use language that is descriptive of a product").

This concept is so important that it is written into the Lanham Act, which states that it is a defense to infringement that the "use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark…of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party."  *See* 15 U.S.C. 1115(b)(4).

Indeed, courts have upheld 12(b)(6) dismissal of a trademark infringement claim on this basis.  *See In re Dual-Deck Video Cassette Recorder Antitrust Litig*., 11 F.3d 1460, 1466 (9th Cir. 1993); *see also Hensley Mfg. v. ProPride, Inc*., 579 F.3d 603 (6th Cir. 2009) (affirming 12(b)(6) dismissal of trademark infringement claim on the basis of fair use).

In determining whether a use is "otherwise than as a mark," courts look to whether the term serves a source-identifying function, i.e., whether the term is being used to associate the product with a manufacturer.  *See Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt*., 618 F.3d 1025, 1040 (9th Cir. 2010).  Indications of use as a trademark include "the lettering, type

style, size and visual placement and prominence of the challenged words." *Id*., quoting MᴄCᴀʀᴛʜʏ ᴏɴ Tʀᴀᴅᴇᴍᴀʀᴋ ᴀɴᴅ Uɴꜰᴀɪʀ Cᴏᴍᴘᴇᴛɪᴛɪᴏɴ, § 11:46.

Here, Plaintiff claims that a Disney licensee – a company called Thinkway Toys – used the phrase "9-inch motorcycle daredevil" in the promotion of its Duke Caboom toy, and that use of this phrase infringes Plaintiff's rights in its trademark 7 INCH DAREDEVIL.  However, the phrase "9-inch motorcycle daredevil" is used simply to accurately describe the toy: it *is* a 9-inch motorcycle daredevil.  *See* Proposed Second Amended Complaint, at ¶ 80 (image reproduced below).



Further, the size and prominence of the font in the advertisement does not stand out from other words in the advertisement.  The font is the same color, size (if not smaller) and style as other non-trademark terms in the advertisement, such as "Makes cool wheelie actions!" and "Try some stunts!"  Indeed, the actual source of the product, Thinkway Toys, is prominently displayed in a different color and different font – i.e., in a trademark sense – on the same advertisement.  *See* 3 GɪʟꜱᴏN ᴏɴ Tʀᴀᴅᴇᴍᴀʀᴋꜱ 13.07 ("If the defendant uses its own trademark prominently on its product or in its advertising in addition to plaintiff's mark, use of plaintiff's mark is more likely to be found to be descriptive.").  The advertisement also asks readers to visit ThinkwayToys.com, another

indicator of source.  Removing these facts even further from the typical case law on this issue, the descriptive phrase "9-inch motorcycle daredevil" that Defendants are alleged to have used is not even Plaintiff's trademark, 7 INCH DAREDEVIL, and Plaintiff's registration is not for the same goods or services.[11]  In fact, Plaintiff **attempted** to register 7 INCH DAREDEVIL in connection with action figures with the U.S. Patent and Trademark Office but was **refused** unless Plaintiff would agree to disclaim the exclusive right to use the term 7 INCH, because it was considered "merely descriptive of" Plaintiff's product.[12]  Plaintiff's application was also refused on the basis that DAREDEVIL was already registered in connection with toy action figures by another entity, so Plaintiff's use of 7 INCH DAREDEVIL would be likely to confuse consumers.  *Id*.

Plaintiff chose to adopt a mark that is descriptive; it cannot now complain that the maker of a 9-inch toy has used similar language to accurately describe its own offering.  *See Eli Lilly & Co. v. Revlon, Inc*., 577 F. Supp. 477, 485 (S.D.N.Y. 1983) (declining to find bad faith and noting that "[i]n choosing a highly descriptive mark, [plaintiff] acted at its peril; where a second comer chooses a descriptive word to name its product, more than simple knowledge of the prior use is needed to show an intent to misappropriate goodwill.") (*quoting E.R. Squibb & Sons, Inc. v. Cooper Laboratories*, 536 F. Supp. 523, 532 (S.D.N.Y. 1982)).  This Court should deny Plaintiff's motion for leave to amend to add a trademark infringement claim on this basis.

### 3.    Amendment to Add "Name" as a Basis for Right of Publicity is Futile.

For similar reasons, Defendants' proposed addition to their right of publicity claim fails under the motion to dismiss standard.  Plaintiff's First Amended Complaint alleged only that Duke Caboom was a "likeness" of Evel Knievel – a claim that fails as a matter of law for several independent reasons laid out in Defendants' motion to dismiss.  In its Proposed Second Amended

---

[11]  Plaintiff's registration is in Class 41, for entertainment services, specifically "Entertainment in the nature of toy motorcycle stunts and stunt performances; Entertainment information; Entertainment services, namely, providing a web site featuring photographic, video and prose presentations featuring toy motorcycle stunts and stunt performances."

[12]  *See* **Exhibit C**, Final Office Action.  This Court may take judicial notice of government documents of public record, including public records of the US Patent and Trademark Office.  *See Landrum v. Tyson*, 2018 U.S. Dist. LEXIS 102268, at *3 n.1 (D. Nev. 2018) ("The Court takes judicial notice of Defendant's USPTO trademark application materials because such documents are public records 'capable of accurate and ready determination by resort to sources whose accuracy cannot be question[ed]'.").

Complaint, Plaintiff seeks to add the use of Evel Knievel's name as a basis for liability.  This also fails.

Nevada's right of publicity statute prevents the commercial use of the name, voice, signature, photograph, or likeness of another without written consent, subject to important exceptions to accommodate policy concerns and the First Amendment. *See* NRS 597.810, 597.790. The term "commercial use" includes use "on or in any product, merchandise or goods or for the purposes of advertising, selling, or soliciting the purchase of any product, merchandise, goods or service."  *See* NRS 597.770.

Here, Plaintiff alleges that "Defendants' statements invoking the name 'Evel Knievel' constitute commercial appropriation…because said statements were made for the purposes of advertising, selling, and soliciting the purchase of tickets to *Toy Story 4*, soliciting for the purchase of licensing agreements for the sale of Duke Caboom merchandise, and soliciting the investment of distinct entities' financial contributions to…*Toy Story 4*."   However, the only alleged "statements" using the name "Evel Knievel" are statements comparing Evel Knievel to Duke Caboom as a reference point to help them understand the Duke Caboom character.  These alleged uses of the Evel Knievel name are well outside of what the statute was designed to protect.  *See generally Hilton v. Hallmark Cards*, 599 F.3d 894, 910 (9th Cir. 2010) (the "core of the right of publicity" is preventing "merchandising a celebrity's image without that person's consent."). Importantly, there are no allegations that the name "Evel Knievel" was used in the film itself, on any product, or in advertising for the movies or any product (such as in a movie trailer, on product packaging, or in a commercial for a product).  Plaintiff's allegations are broken out below.

Internal statements.   To the extent Plaintiff is seeking to hold Defendants liable for statements made internally or to companies within the Disney umbrella, this fails as a matter of law.  The right of publicity is meant to protect the ***commercial*** value of one's name and likeness. *See Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 573 (1977).  Logically, then, if a use is not a commercial exploitation, it is not covered by the right of publicity.  *See id.*, 433 U.S. 562, 576 ("No social purpose is served by having the defendant get free some aspect of the plaintiff ***that would have market value and for which he would normally pay***.") (emphasis added).

18

This is similar in reasoning to the trademark context outlined above.  Just as a use of a trademark "in a way that does not communicate it to the public is analogous to an individual's private thoughts about a trademark" and therefore does not violate the Lanham Act,[13] without the "public," there can be no right of "publicity."  The rationale behind the right of publicity evaporates when a person's name is used in a private, non-public facing context.  The purpose behind the law – to prevent the unfair use of a person's identity to garner attention (and ultimately money) from the public – would be eviscerated if private or intra-company uses of someone's name, such as those alleged by Plaintiff, were statutory violations.  *See generally Lugosi v. Universal Pictures*, 25 Cal. 3d 813, 824, 160 Cal. Rptr. 323, 329, 603 P.2d 425, 431 (Cal. 1979), *abrogated on other grounds* ("The so-called right of publicity means in essence that the reaction **of the public** to name and likeness…endows the name and likeness of the person involved with commercially exploitable opportunities.).[14]

Statements about Duke Caboom to Third Parties.  Plaintiff is left with Defendants' alleged comparison between the movie character Duke Caboom and Evel Knievel in speaking to third parties; although the Proposed Second Amended Complaint does not state specifically what exact words were said or written, the allegations seem to be that Defendants stated that Duke Caboom was an "Evel Knievel-esque" character, like "a Canadian Evel Knievel," or told outside parties to "think [of] Evel Knievel" as shorthand for explaining that Duke Caboom is a 1970s-era motorcycle stuntman.  Taking this as true, it is simply not enough.  There is no allegation that Defendants used the name Evel Knievel "on or in any product, merchandise, or goods."  As such, Plaintiff must argue that Defendants have used the name Evel Knievel for the purposes of advertising, selling, or soliciting the purchase of a product, merchandise, goods, or services.

/ / /

---

[13] *See supra*, *Saint Louis Univ. v. Meyer*, 625 F. Supp. 2d 827, 830 (E.D. Mo. 2008), *quoting 1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 409 (2nd Cir. 2005) and collecting authorities.

[14] The law generally recognizes this distinction; it is replete with doctrines that prevent intra-company statements from giving rise to liability.  *Cf. Simpson v. Mars*, 113 Nev. 188, 929 P.2d 966, 968 (Nev. 1997) (recognizing intra-corporate communications privilege in defamation context); *Collins v. Union Federal Sav. & Loan Ass'n*, 99 Nev. 284, 303, 662 P.2d 610 (Nev. 1983) (agents and employees of a corporation cannot conspire with their corporate principal or employer when acting on behalf of the corporation).

As to statements to third parties about the movie, to the extent Plaintiff would argue that Defendants were indirectly "advertising" *Toy Story 4* or soliciting its purchase by speaking about Duke Caboom to third parties, this necessarily fails because *Toy Story 4* is an expressive work protected by the First Amendment – this is true of expressive works even when profitable, even when advertised and promoted, and even when fictional.[15]   Likewise, Nevada's right of publicity statute expressly does not apply to portrayals of real people in expressive works like films unless "directly connected with commercial sponsorship," ***or advertising for the same***.[16]   *See* NRS 597.790(d).  As such, even if Duke Caboom was meant to be a direct portrayal of Evel Knievel – which he was not – the type of conduct alleged here would not be actionable.  Indeed, it would be an absurd result if Defendants could use Evel Knievel's name or likeness in the film and its advertising freely (as the statute and case law contemplates for expressive works), but be unable to compare a non-Evel Knievel "stunt motorcycle driver who often fails" type of character in the movie to the history of Evel Knievel.[17]   *See Premier One Holdings, Inc. v. BAC Home Loans Servicing LP*, 2013 U.S. Dist. LEXIS 112590, at *9 (D. Nev. 2013) (noting that "a statute's

---

[15]   *See Guglielmi v. Spelling-Goldberg Productions*, 25 Cal. 860, 865 (Cal. 1979) (affirming dismissal of right of publicity claim based on portrayal in fictionalized account of life); *Tyne v. Time Warner Entm't Co., L.P.*, 901 So. 2d 802, 803 (Fla. 2005) (portrayal in film not "for a commercial purpose" under Florida statute); *see also Brown v. Showtime Networks, Inc*., 394 F. Supp. 3d 418, 439-40 (S.D.N.Y. 2019) (granting motion to dismiss and noting that "any depiction of [plaintiff] in the advertising for a constitutionally protected film is itself protected and not actionable…"); *Vijay v. Twentieth Century Fox Film Corp*., 2014 U.S. Dist. LEXIS 152098, at *14 (C.D. Cal. 2014) ("Given that Plaintiff's claims for appropriation of likeness and right of publicity are based on his brief scene in two expressive works, it is unfathomable that Plaintiff would be able to amend his complaint to allege facts that would cure these two causes of action of their defects" and dismissing with prejudice); *Collier v. Murphy*, 2003 U.S. Dist. LEXIS 4821, at *8 (N.D. Ill. 2003) (dismissing statutory right of publicity claim based on alleged depiction of real person in cartoon series where the statute "unambiguously exempts artistic works"); *Nurmi v. Peterson*, 1989 U.S. Dist. LEXIS 9765 *7-*9 (C.D. Cal. 1989) (dismissing statutory and common-law right of publicity claims); *De Havilland v. FX Networks, LLC*, 21 Cal. App. 5th 845, 861-62, 230 Cal. Rptr. 3d 625, 639 (Cal. App. 2018) (use of name of woman with image of the actress playing her in promotion does not support right of publicity claim).

[16]   Although the statute states that the issue of whether a use is "directly connected with commercial sponsorship" is a question of fact to be determined by the trier of fact, this Court may make the determination here as the law is well-settled that a film is not a commercial use. Motions to dismiss are routinely granted on right of publicity claims against films.  *See* n. 15, *supra*.

[17]   Plaintiff acknowledges in its complaint that Evel Knievel was known as much for his failed jumps and crashes as his showmanship.  *See, e.g*., First Amended Complaint, at ¶ 19.  Yet his history as a failed stuntman is not a quality that one person alone can own.  A person can own rights in his name, image, voice, signature, or likeness, but not the archetype qualities of a stuntman with more bravado than skill.  Super Dave Osborne, Canadian stuntman Ken "the Mad Canadian" Carter and others have shared the same qualities.

20

language should not be read to produce absurd or unreasonable results.") (quotations and citation omitted).

As to the alleged statements to potential licensees, Plaintiff alleges without factual support and "upon information and belief" that Defendants would tell potential licensees to "Think [of] Evel Knievel" in attempting to pitch licensing agreements for the sale of Duke Caboom merchandise. Again, the right of publicity is meant to protect the commercial value of one's name and likeness. Unlike the use of one's name on a product (e.g., the George Foreman Grill) or the use of one's image in a television commercial (e.g., Michael Phelps in a Subway ad), permission (and payment) is not required to speak or write words comparing a character in a movie with a real person. *See generally Comedy III Prods., Inc. v. Gary Saderup, Inc*., 25 Cal. 4th 387, 403, 106 Cal. Rptr. 2d 126, 139, 21 P.3d 797, 807 (Cal. 2001) ("What the right of publicity holder possesses is not a right of censorship, but a right to prevent others from misappropriating the economic value generated by the celebrity's fame through the merchandising of the 'name, voice, signature, photograph, or likeness' of the celebrity."). There is no allegation that these potential licensees advertised whatever product they ultimately created using the Evel Knievel name. The fact that Defendants are alleged to have told potential unnamed licensees to think of Duke Caboom as an Evel Knievel-type character cannot be enough to state a claim for violation of Mr. Knievel's right of publicity. *See, e.g*., *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" which occurs when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

What Plaintiff seeks to allege here is not actionable. There is no basis for Plaintiff's assertion that Defendants' alleged comparison of Duke Caboom to Evel Knievel is a violation of Mr. Knievel's right of publicity, and this Court should decline to permit amendment of the First Amended Complaint.

/ / /

/ / /

**IV.      CONCLUSION**

This Court should decide Defendants' pending motion to dismiss prior to evaluating Plaintiff's motion to amend.  If this Court permits amendment of the First Amended Complaint, this Court should only then evaluate Plaintiff's proposed amendments.  However, these proposed amendments fail as a matter of law and are therefore futile.  Defendants respectfully request that this Court deny Plaintiff's motion for leave to amend.

DATED this 13th day of August, 2021.

**GREENBERG TRAURIG, LLP**


    */s/ Mark G. Tratos*
MARK G. TRATOS, ESQ.
Nevada Bar No. 1086
KARA B. HENDRICKS, ESQ.
Nevada Bar No. 7743
DONALD L. PRUNTY, ESQ.
Nevada Bar No. 8230
BETHANY L. RABE, ESQ.
Nevada Bar No. 11691
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada  89135

*Counsel for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 13th day of August, 2021, a true and correct copy of the foregoing **R RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT** was filed electronically via the Court's CM/ECF system. Notice of filing will be served on all parties by operation of the Court's EM/ECF system, and parties may access this filing through the Court's CM/ECF system.


                               */s/ Andrea Flintz*

                               an employee of Greenberg Traurig, LLP

1

## <u>INDEX OF EXHIBITS</u>

2

1.   Exhibit A -- Bates # K&K003891-92 and K&K003928-29

3

2.   Exhibit B -- Declaration of Kimberly J. Cooper

4

3.   Exhibit C -- Final Office Action

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28